# IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF GEORGIA
### COLUMBUS DIVISION

| | | |
|---|---|---|
| BARBARA GOODMAN, LISA COUNTRYMAN, SHARON CLARKE, CHERYL GALLOPS, SHERRI STUCKEY and LAUREN SPIVEY, individually, and on behalf of all others similarly situated, | ) ) ) ) ) ) ) | |
| Plaintiffs, | ) ) | |
| v. | ) ) | Case No.: 4:21-cv-15 |
| COLUMBUS REGIONAL HEALTHCARE SYSTEM, INC. | ) ) ) | |
| Defendant. | ) | |

## FIRST AMENDED COMPLAINT

Plaintiffs Barbara Goodman, Lisa Countryman, Sharon Clarke, Cheryl Gallops, Sherri Stuckey and Lauren Spivey (collectively, "Plaintiffs"), individually and as representatives of a class of participants in and beneficiaries of the Piedmont Columbus Regional Retirement Savings Plan, *f/k/a* Columbus Regional Healthcare System Retirement Savings Plan (the "Plan"), bring this action under the Employee Retirement Income Security Act of 1974, as amended, 29 U.S.C. §§ 1001-1461 ("ERISA") against Defendant Columbus Regional Healthcare System, Inc. ("Columbus Regional"), stating their complaint as follows:

## I.  INTRODUCTION

1.      Plaintiffs were participants in an ERISA defined contribution plan sponsored by their employer, Columbus Regional.  Columbus Regional terminated the Plan effective May 31, 2019, following Columbus Regional's acquisition by Piedmont Healthcare, Inc.  At that time, the Plan had approximately $183 million in assets and 4,700 participants with account balances.

2.      Defined contribution plans have become America's primary means of saving for retirement.  This is the result of a shift from traditional, defined benefit "pension" plans to defined contribution plans.  The United States Supreme Court explained the difference in *Thole v. U.S. Bank, N.A.*, 140 S. Ct. 1615 (2020):

> [i]n a defined-benefit plan, retirees receive a fixed payment each month, and the payments do not fluctuate with the value of the plan or because of the plan fiduciaries' good or bad investment decisions.  By contrast, in a defined-contribution plan, such as a 401(k) or 403(b) plan, the retirees' benefits are typically tied to the value of their accounts, and the benefits can turn on the plan fiduciaries' particular investment decisions.

*Id*. at 1618.  Thus, in a defined contribution plan, the participants – and not their employer – bear the risks of the employer's imprudent investment decisions.

3.      Additionally, employers have the option to make plan participants responsible for paying both the plan's investment and administrative expenses.  Many employers, including

Columbus Regional, do this.  In such instances, the plan participants bear not only the investment risk of their employer's decisions, but also the costs of any excessive investment and administrative expenses as well.

4.      As the statutory plan sponsor and administrator, and named fiduciary of the Plan, Columbus Regional had the fiduciary duty to manage the Plan prudently and not waste participants' money.  Columbus Regional failed in its duties from start to finish by: (i) failing to prudently select and monitor the Plan's investment options, and failing to timely remove imprudent investments; (ii) selecting and retaining investments with unjustifiably high management fees; (iii) failing to monitor and prudently manage the Plan's administrative expenses; (iv) causing the Plan to enter into one or more prohibited transactions with a party-in-interest to the Plan; and (v) failing to adequately disclose to participants the information they needed to make informed investment decisions, including information about the excessive fees being charged to participants' individual retirement accounts.

5.      Plaintiffs are not second-guessing Columbus Regional's investment decisions with the benefit of hindsight.  The information Columbus Regional needed to make informed and prudent investment decisions was readily available when it made those decisions.  Columbus Regional either failed to do even minimal due diligence or, worse, simply ignored readily available information.   As a result, Columbus Regional stocked the Plan with overpriced and underperforming funds, needlessly wasting participants' money.

6.      Each dollar Columbus Regional wasted was one less dollar in participants' accounts, dollars that would have generated returns and built retirement savings.  Those lost returns compound over time so each wasted dollar matters greatly.  The United States Department of

Labor, which oversees ERISA, estimates that over thirty-five years, a 1% increase in fees and expenses can reduce a participant's account balance by 28%.[1]

7.      Here, for the period beginning January 1, 2015 through the date the Plan was terminated, May 31, 2019, Plan participants lost approximately $4.6 million due to excessive fees and costs as a result of Columbus Regional's breaches of fiduciary duty.  Columbus Regional is liable to the Plan and participants for those losses, which continue to accrue investment opportunity losses.  That on-going loss is significant.  For example, from June 2019 through the date of filing, the Russell 1000 Growth Index (in which Plaintiff Stuckey had invested the bulk of her assets) has risen more than 50 percent.

## II.  JURISDICTION AND VENUE

8.      This Court has exclusive jurisdiction over the subject matter of this action under 29 U.S.C. § 1132(e)(1) and 28 U.S.C. § 1331 because it is an action under 29 U.S.C. § 1132(a)(2).

9.      This District and Division are the proper venue for this action under 29 U.S.C. § 1132(e)(2) and 28 U.S.C. § 1391(b) because they are the district and division in which the Plan was administered, where at least one of the alleged breaches took place, and where at least one defendant may be found.

---

[1] *See* U.S. Dep't of Labor, Emp. Benefits Sec. Admin., *A Look at 410(k) Plan Fees*, 1-2 (Aug. 2013), https://www.dol.gov/sites/dolgov/files/EBSA/about-ebsa/our-activities/resource-center/publications/a-look-at-401k-plan-fees.pdf.

### III.  THE PLAN, PARTIES, PARTIES-IN-INTEREST AND STANDING

#### A.  The Plan

10.     The Plan was an ERISA 403(b) defined contribution, individual account, employee benefit plan under 29 U.S.C. § 1002(2)(A) and § 1002(34).  The Plan was established and maintained under a written document in accordance with 29 U.S.C. § 1102(a).

#### B.     Defendant Columbus Regional

11.     Defendant Columbus Regional is a Georgia corporation with its principal place of business in Columbus, Georgia.  In 2018, Columbus Regional Healthcare, Inc. was acquired by Atlanta-based Piedmont Healthcare, Inc., at which time Columbus Regional became a wholly owned subsidiary of Piedmont Healthcare, Inc.  Columbus Regional's corporate officers are located in Columbus and Atlanta, Georgia.

12.     Columbus Regional's registered agent for service is CSC of Cobb County, Inc., located at 192 Anderson Street, S.E., Suite 125, Marietta, Georgia 30060.

#### C.     Statutory "Parties-In-Interest"

13.     Non-party Transamerica Financial Life Insurance Company held the assets of the Plan as trustee, and its affiliate corporation, non-party Transamerica Retirement Solutions (collectively, "Transamerica"), provided recordkeeping and other services.  Under 29 U.S.C. § 1002(14), Transamerica was a "party-in-interest" to the Plan, whose services and compensation Columbus Regional had a duty to monitor.

14.     Non-party Merrill Lynch, Pierce, Fenner & Smith Incorporated ("Merrill") provided investment advisory services and other services to the Plan and participants.  Under 29 U.S.C. § 1002(14), Merrill was a "party-in-interest" to the Plan, whose services and compensation Columbus Regional had a duty to monitor.

###### D.   Plaintiffs and Standing

15.    Plaintiffs have both statutory and constitutional standing.  First, 29 U.S.C. § 1132 (a)(1)-(3) confers standing on a plan "participant" to bring claims for ERISA violations, including claims under 29 U.S.C. § 1109 (a) for breach of fiduciary duty.  Claims pursuant to 29 U.S.C. § 1109(a) are brought in a representative capacity on behalf of the Plan.  Each Plaintiff was, during the class period,[2] a "participant" in the Plan as defined in 29 U.S.C. § 1002(7).  Each Plaintiff thus has statutory standing.  Second, as to constitutional standing (or, "Article III standing"), each Plaintiff personally suffered concrete and particularized injuries.  During the class period, each Plaintiff was invested in the funds at issue and paid excessive fees charged to their respective individual accounts.  That is sufficient to confer constitutional standing.  Thus, Plaintiffs have standing to bring claims individually and in a representative capacity on behalf of the Plan and the participants in the Plan.

16.    Plaintiff Barbara Goodman resides in Columbus, Georgia and, during the class period, was a "participant" in the Plan under 29 U.S.C. § 1002(7) because she and her beneficiaries were eligible to receive benefits under the Plan.  Plaintiff Goodman was invested in the funds at issue and paid excessive fees charged to her individual account.

17.    Plaintiff Lisa Countryman resides in Salem, Alabama and, during the class period, was a "participant" in the Plan under 29 U.S.C. § 1002(7) because she and her beneficiaries were

---

[2] Under ERISA, claims for breach of fiduciary duty may be brought for "(1) six years after (A) the date of the last action which constituted a part of the breach or violation, or (B) in the case of an omission the latest date on which the fiduciary could have cured the breach or violation . . . ."  29 U.S.C. § 1113.  *See also Tibble v. Edison Int'l*, 135 S. Ct. 1823, 1829 (2015) ("A plaintiff may allege that a fiduciary breached the duty of prudence by failing to properly monitor investments and remove imprudent ones. In such a case, so long as the alleged breach of the continuing duty occurred within six years of suit, the claim is timely.").  Accordingly, here, the class period begins six years before the date of the filing of this Complaint.

eligible to receive benefits under the Plan.  Plaintiff Goodman was invested in the funds at issue and paid excessive fees charged to her individual account.

18.     Plaintiff Sharon Clarke resides in Columbus, Georgia and, during the class period, was a "participant" in the Plan under 29 U.S.C. § 1002(7) because she and her beneficiaries were eligible to receive benefits under the Plan.  Plaintiff Goodman was invested in the funds at issue and paid excessive fees charged to her individual account.

19.     Plaintiff Cheryl Gallops resides in Hamilton, Georgia and, during the class period, was a "participant" in the Plan under 29 U.S.C. § 1002(7) because she and her beneficiaries were eligible to receive benefits under the Plan.  Plaintiff Goodman was invested in the funds at issue and paid excessive fees charged to her individual account.

20.     Plaintiff Sherri Stuckey resides in Phenix City, Alabama and, during the class period, was a "participant" in the Plan under 29 U.S.C. § 1002(7) because she and her beneficiaries were eligible to receive benefits under the Plan.  Plaintiff Goodman was invested in the funds at issue and paid excessive fees charged to her individual account.

21.     Plaintiff Lauren Spivey resides in Phenix City, Alabama and, during the class period, was a "participant" in the Plan under 29 U.S.C. § 1002(7) because she and her beneficiaries were eligible to receive benefits under the Plan.  Plaintiff Goodman was invested in the funds at issue and paid excessive fees charged to her individual account.

22.     The funds in which Plaintiffs were invested, which cover all of the asset classes in which the Plan was invested, are more particularly described in **Schedule A** of the Appendix to this Complaint (all Schedules are in the Appendix).

## IV.  APPLICABLE LAW

23.     Columbus Regional was the plan administrator under 29 U.S.C. § 1002(16)(A)(i), plan sponsor under 29 U.S.C. § 1002 (16)(B) and a "named fiduciary" under the plan instrument and 29 U.S.C. § 1002(a).  As such, Columbus Regional had fiduciary responsibility for the Plan's investments and administrative expenses.

### A.     Fundamental Fiduciary Principles

24.     The duties owed by an ERISA fiduciary to plan participants are the "highest known to the law."  *See Donovan v. Bierwirth*, 680 F.2d 263, 272 n.8 (2d Cir. 1982) (*citing* Restatement (Second) of Trusts § 2 cmt. b (1959)).

25.     ERISA's statutory standard of care encompasses the traditional fiduciary duties of prudence and loyalty.  *See, e.g., Pledger v. Reliance Trust Co.*, 240 F. Supp. 3d 1314, 1321 (N.D. Ga. 2017).  Under ERISA, a plan fiduciary must:

> discharge his duties . . . *solely* in the interest of the participants and beneficiaries and
>
> (A) for the *exclusive* purpose of: (i) providing benefits to participants and their beneficiaries; and (ii) defraying reasonable expenses of administering the plan; [and]
>
> (B) with the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent man acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of a like character and with like aims . . . .

29 U.S.C. § 1104 (emphasis added).

26.     The fiduciary duties imposed by ERISA are "derived from the law of trusts" and "[i]n determining the contours of an ERISA's fiduciary's duty, courts often must look to the law of trusts."  *Tibble v. Edison Int'l*, 135 S. Ct. 1823, 1828 (2015) (internal citations omitted).  In particular, the Supreme Court has instructed lower courts to look to the Restatement (Third) of

Trusts (Am. Law Inst. 2007), the Uniform Prudent Investor Act (1995) ("UPIA"), and leading trust

law treatises, among other authorities.  *Id.*

27.     The Uniform Prudent Investor Act summarizes a key aspect of fiduciary duty

plainly: "Wasting beneficiaries' money is imprudent."  UPIA at § 7 cmt.

28.     In determining whether an ERISA fiduciary breached its duty of prudence, courts

focus on

> whether the fiduciary engaged in a reasoned decision-making process, consistent
> with that of a prudent man acting in a like capacity. . . . ERISA requires fiduciaries
> to employ appropriate methods to investigate the merits of the investment and to
> structure the investment as well as to engage in a reasoned decision-making
> process, consistent with that of a prudent man acting in a like capacity.

*Tatum v. RJR Pension Inv. Comm.*, 761 F.3d 346, 356-58 (4th Cir. 2014) (internal punctuation and

citation omitted).

### B.     Specific Fiduciary Duties

29.     The duty of competence:  A principal duty of an ERISA fiduciary is to be

competent.  *See* 29 U.S.C. § 1104 (a fiduciary shall discharge his duties with "care, skill, prudence,

and diligence").  "A trustee's lack of familiarity with investments is no excuse: under an objective

standard trustees are to be judged according to the standards of others 'acting in a like capacity

and familiar with such matters.'"  *Katsaros v. Cody*, 744 F.2d 270, 279 (2d Cir. 1984) (applying

ERISA).  Where the trustee lacks the requisite knowledge and experience, the trustee may engage

professional advisors.  *See, e.g.,* Restatement (Third) of Trusts § 90 cmt. d.

30.     The duty of prudent delegation: A trustee is not required personally to perform all

aspects of the investment function, but must not abdicate its responsibilities and must not delegate

unreasonably.  *See* Restatement (Third) of Trusts cmt. j.

> As in other matters of delegation, the trustee must not abuse the discretion to
> delegate. . . .  In deciding what as well as whether to delegate and in selecting,

instructing, and supervising or monitoring agents, the trustee has a duty to the beneficiaries to act as a prudent investor would act under the circumstances. The trustee must exercise care, skill, and caution in establishing the scope and specific terms of any delegation, and must keep reasonably informed in order to monitor the execution of investment decisions or plans.

*Id.*

31.     **The continuing duty to monitor investments and to remove or replace imprudent investments:**  The United States Supreme Court held in *Tibble*: "[u]nder trust law, a trustee has a continuing duty to monitor trust investments and remove imprudent ones . . . separate and apart from the trustee's duty to exercise prudence in selecting investments at the outset."  135 S. Ct. at 1828.  "The trustee must systematically consider all the investments of the trust at regular intervals to ensure that they are appropriate."  *Id.*  Thus, to discharge this duty, Columbus Regional must have had a prudent process and method for selecting, monitoring and retaining prudent, cost-effective investments for the Plan, and for removing imprudent investments.

32.     **The duty to justify high-cost active management strategies:**  The Plan was invested in many "actively managed" funds.  "Active investment management" and similar terms refer to investment strategies that try to achieve above average market returns over time, that is, actively managed funds try to "beat the market."

33.     Active managers try to identify and exploit market inefficiencies.[3]  *See* Restatement (Third) of Trusts § 90 cmt. h(2) (active management involves "searching for advantageous segments of a market, or for individual bargains in the form of underpriced securities.").   The search for potential market inefficiencies requires research and analysis, which increases investment management costs.  *See id.*

_____

[3] In "efficient" markets, "available information is rapidly digested and reflected in the market prices of securities."  *See* Restatement (Third) of Trusts § 90 General Note on Comments e through h.

34.     While prudent investment principles allow for active management strategies in appropriate circumstances, the additional risks and costs involved "must be justified by realistically evaluated return expectations."  *Id.*  Additionally, "[a] trustee's approach to investing must be reasonably supported in concept and must be implemented with proper care, skill and caution."  Restatement (Third) of Trusts cmt. f.  Thus, in deciding whether to pursue an active management strategy, a fiduciary should determine that "gains from the course of action in question can reasonably be expected to compensate for its additional costs and risks."  *Id.* at cmt. h(2).

35.     In the context of an ERISA defined contribution plan, prudence requires a fiduciary to have a realistic expectation that an active management strategy will generate net returns equal to or greater than reasonable alternatives, such as investing in low-cost index funds (a "passive" strategy).[4]

36.     In sum, before deciding to pursue an active management strategy, especially one that seeks to find bargains in an efficient market, a prudent fiduciary must determine that:

a)     gains from the course of action in question can reasonably be expected to compensate for its additional costs and risks;

b)     the course of action to be undertaken is reasonable in terms of its economic rationale and its role within the trust portfolio; and

c)     there is a credible basis for concluding that the trustee – or the manager of a particular activity – possesses or has access to the competence necessary to carry out the program and, when delegation is involved, that its terms and supervision are appropriate.

---

[4] A passive management strategy "aim[s] to maximize returns over the long run by not buying and selling securities very often.  In contrast, an actively managed fund often seeks to outperform a market (usually measured by some kind of index) by doing more frequent purchases and sales."  U.S. Sec. and Exch. Comm'n, *Investor Bulletin: Index Funds* (Aug. 6, 2018).  *See also A Look at 401(k) Plan Fees*, *supra*, at 7 ("Passively managed funds seek to obtain the investment results of an established market index, such as the Standard and Poor's 500, by duplicating the holdings included in the index.").

Restatement (Third) of Trusts § 90 cmt. h(2).[5]

37.    **The duty to delegate to competent professionals:**   Plan sponsors often hire investment advisors to advise them on investment strategy and to recommend mutual funds for the plan's investment menu.  (Here, Columbus Regional hired Merrill, which in turn recommended the mutual funds and fund managers chosen by Columbus Regional.).   When a plan sponsor chooses to engage an advisor and pursue an active management strategy, the sponsor must determine "there is a credible basis for concluding that [the advisor] possesses or has access to the competence necessary to carry out the program and, when delegation is involved, that its terms and supervision are appropriate."  *Id.*

38.    Numerous academic and professional studies conclude that virtually no actively managed funds beat the market consistently.  *See id.* ("fiduciaries and other investors are confronted with potent evidence that . . .  efforts to 'beat the market' . . . ordinarily promises little or no payoff, in fact, often a negative payoff").

39.    As S&P Global (formerly, Standard and Poor's) reports:

[R]esearch tells us that relatively few active managers are able to outperform passive managers over any given time period, either short-term or long-term. But the true measure of successful active management is whether a manager or strategy can deliver above-average returns consistently over multiple periods. Demonstrating the ability to outperform repeatedly is the only proven way to differentiate a manager's skill from luck. Through research published in our Persistence Scorecards, we show that relatively few funds can consistently stay at the top.[6]

---

[5]  The theoretical question of active versus passive strategies is not at issue here.  The question here is whether Columbus Regional acted prudently by paying the high fees charged by actively managed funds in light of the expected returns of those funds.  A prudent fiduciary should avoid any investment that is not reasonably expected to generate returns sufficient to cover its costs.

[6]   S&P Dow Jones Indices, SPIVA Statistics & Reports (June 30, 2020), https://www.spindices.com/spiva/#/reports/regions.

Similarly, a comprehensive study published in the *Journal of Finance* surveyed investment advisors having a 91% share of the U.S. consulting market and found "no evidence" that the advisors' recommendations of funds added value, "suggesting that the search of winners, encouraged and guided by investment consultants, is fruitless."[7]

40.     While it may be prudent under certain circumstances for a plan sponsor to engage investment professionals to pursue an active management strategy, prudence requires the sponsor to determine that the professionals are competent to do so successfully.  At a minimum, a prudent sponsor should confirm that the professionals to have a track record of choosing actively managed funds that outperform lower cost alternatives.

41.     **The duty to defray reasonable administrative expenses:**  The day-to-day operation of an ERISA plan requires certain basic administrative functions, such as recordkeeping and accounting, and other discretionary services, such as providing customer service representatives, online account management, and educational programs.[8]  The fees for these services, as well as the fees charged by investment advisors to the plan, are components of administrative expenses.  ERISA specifically requires a plan sponsor to defray reasonable administration expenses.  *See* 29 U.S.C. § 1104(A)(ii).  The Uniform Prudent Investor Act provides, "[i]n investing and managing trust assets, a trustee may only incur costs that are appropriate and reasonable . . . ."  UPIA at § 7.  Thus, "[i]n devising and implementing strategies

---

[7] Tim Jenkinson *et al*., *Picking Winners? Investment Consultants' Recommendations of Fund Managers*, 71 The Journal of Finance 2333, 2333 (October 2016).  For the purpose of the Complaint, it matters only that picking winners is difficult (which is beyond dispute) and that Columbus Regional was unable to execute such a strategy in a prudent manner.

[8] *A Look at 401(k) Plan Fees, supra,* at 3.

for the investment and management of trust assets, trustees are obligated to minimize costs." *Id.* at cmt.

42.    **The duty not to engage in or to allow prohibited transactions:** ERISA prohibits certain transactions, including service contracts, between a plan and a party-in-interest. *See* 29 U.S.C. § 1106.   Plan fiduciaries shall not cause the plan to enter into a prohibited transaction. *Id.* at § 1106(a)(1)(C).   Certain exemptions are made where the party-in-interest is paid "no more than reasonable compensation," 29 U.S.C. § 1108(b)(2), but "an ERISA plaintiff need not plead the absence of exemptions to prohibited transactions.   It is the defendant who bears the burden of proving a section 408 exemption. . . ." *Allen v. GreatBanc Trust Co*., 835 F. 3d 670, 676 (7th Cir. 2016) (citations omitted).

43.    **The duty to disclose information to participants:** Plan administrators have a duty to provide participants with material information respecting the plan, investment options and fees and expenses, on a regular basis.   The Eleventh Circuit held, in *Jones v. American General Life and Accident Insurance Co.*, 370 F.3d 1065 (11th Cir. 2004), "that an ERISA participant has a right to accurate information, and that an ERISA administrator's withholding of information may give rise to a cause of action for breach of fiduciary duty." *Id.* at 1072 (citation omitted).[9]

---

[9] *See also Brannen v. First Citizen Bankshares Inc. ESOP Plan*, No. 6:15-cv-30 (S.D. Ga. Aug. 26, 2016), at 20 ("Courts have concluded that ERISA plan participants may state a cause of action for breach of fiduciary duty based on a failure to disclose information to plan participants" though they are "reluctant to require disclosure in cases based on inside information.").   Plaintiffs do not allege that Columbus Regional withheld non-public, "inside," information.   Rather, Plaintiffs allege Columbus Regional failed to disclose the excessive fees being charged participants, as well as its own imprudent practices and methodology in administering the Plan.

## V.  COLUMBUS REGIONAL'S FIDUCIARY BREACHES

### A.      The Investment Menu

44.      The Plan was structured as a cafeteria plan.  Participants could choose from a menu of investment options, but those options were selected and maintained by Columbus Regional. Participants could choose which asset classes[10] to invest in, but had no control over the cost or performance of the funds selected by Columbus Regional within each asset class.  Participants were captive investors whose choices were limited by the investment decisions made by Columbus Regional.  The value of their individual accounts depended in large measure upon the decisions Columbus Regional made as investment fiduciary to the Plan.

### B.      Columbus Regional's Active Management Strategy

45.      The Plan's investment options mainly consisted of actively managed mutual funds. The mutual funds' investment managers charged fees based on a percentage of the fund's total assets.  The investment management fees were deducted from investment returns, thus reducing the net returns on participants' investments.

46.      Columbus Regional selected and maintained actively managed funds in the hope of generating "excess returns," i.e., returns exceeding market returns, net of fees and expenses.

47.      In deciding whether to pursue an expensive and risky active management strategy, Columbus Regional was obligated, first, to determine that "gains from the course of action in question [could] reasonably be expected to compensate for its additional costs and risks."

---

[10] An "asset class" is a grouping of similar investments, e.g., equities (stocks), fixed income (bonds) or cash.  Classes are often further divided into sub-classes, such as "large cap," "small cap," "growth," "international" and so forth.  In the context of mutual funds, the asset class typically is defined by reference to a broad market index generally reflecting the market sector in which the fund invests.  Familiar indexes include the S&P 500, the Russell 1000 and the NASDAQ Composite.

Restatement (Third) of Trusts § 90 cmt. h(2).  Thus, Columbus Regional's active management strategy was justified only if it had realistic expectations of returns sufficient to cover the substantial additional costs and risks of the strategy.

48.     Second, Columbus Regional had to determine that the fund managers implementing the active management strategy had "the competence necessary to carry out [the strategy]."  *Id.*

49.     As shown below, Columbus Regional did not determine that its active management strategy was justified, nor did it determine that the fund managers had the competence to carry out that strategy.

50.     Columbus Regional breached its duties by failing to have a prudent, reasoned process for deciding upon and carrying out its investment strategy.  Moreover, Columbus Regional failed to monitor the funds and assets it selected for the Plan menu and failed to replace its imprudent selections with prudent ones.  Columbus Regional's investment strategy was a failure, resulting in millions of dollars of losses to Plan participants.

### C.     Columbus Regional's Active Management Strategy Was Imprudent.

#### 1.     Active management is a high risk strategy.

51.     While it is not imprudent *per se* to pursue an active management investment strategy, the clear consensus is that, in efficient markets, active management is a high risk strategy.

52.     Readily available empirical data demonstrates that, over time and across market sectors, the substantial majority of actively managed funds consistently fail to outperform the market.  This failure is most pronounced in asset classes demonstrating a high degree of market efficiency.

53.     S&P Global research shows that, as of June 30, 2020, 63% of actively managed U.S. large-cap funds underperformed the S&P 500 index annually, 71% underperformed on a three-

year basis and 78% underperformed on a five-year basis.[11]   Those numbers reflect fund performance on an aggregated basis; the results for individual funds are worse.  S&P Global reports that of the top half of domestic equity funds in 2015, only 3.84% maintained that status annually through 2019, significantly below what random chance would predict.  Of the top quarter of those funds in 2015, a mere 0.18% maintained that performance over the next four years, again below random chance.[12]

54.   There are systemic reasons why so few active investment managers are able to outperform the major U.S. capital markets with any consistency.  Active management relies on exploiting market inefficiencies (*e.g.*, identifying an undervalued stock), but the major capital markets in which most mutual funds invest are highly efficient.  There are few, if any, inefficiencies to exploit.  As explained in the Restatement:

> Economic evidence shows that, from a typical investment perspective, the major capital markets of this country are highly efficient, in the sense that available information is rapidly digested and reflected in the market prices of securities. . . . Empirical research supporting the theory of efficient markets reveals that in such markets skilled professionals have rarely been able to identify underpriced securities (that is, to outguess the market with respect to future return) with any regularity.  In fact, evidence shows that there is little correlation between fund managers' earlier successes and their ability to produce above-market returns in subsequent periods.

Restatement (Third) of Trusts § 90 General Note on Comments e through h.

55.   Thus, the Restatement notes, "[c]urrent assessments of the degree of efficiency support the adoption of various forms of passive strategies by trustees, such as reliance on index funds."  *Id.*

---

[11] SPIVA, *supra*, at https://www.spindices.com/spiva/#/reports/regions.

[12] *Id.* (at Persistence Scorecard tab).

56.     S&P Global data (*see* **Schedules C-1 and C-2**) shows that, both before and during the class period, the funds in the asset classes designated by Columbus Regional consistently underperformed their own chosen benchmarks.[13]   Schedule C-2 compares, year by year, the performance of actively-managed funds to their passively-managed counterparts (represented by the index). Schedule C-1 shows the performance over one to fifteen year periods as of December 31, 2019.  As is readily apparent from Schedules C-1 and C-2, while some active fund managers in some asset classes will sometimes outperform their benchmarks, the large majority fail (*see* Schedule C-1, "Percentage Underperforming" column).   Only a very few are consistently successful.  Faced with this data, Columbus Regional should have proceeded with great caution, knowing that an active management strategy was a high stakes, low-percentage bet.  Nevertheless, Columbus Regional heedlessly made that bet – while playing with participants' money.

57.     Moreover, actively managed funds typically charge higher fees than passively managed funds.[14]   These costs are significant.  As the Department of Labor reports, investment management fees are "by far the largest component" of all ERISA plan fees and expenses.[15]

### 2.     Expense Ratios are the best way to understand investment management fees and costs.

58.     To determine whether reasonably expected returns justified the costs of its active management strategy, Columbus Regional had to understand those costs.  The best tool for that was the "expense ratios" of the mutual funds it selected.  Further, expense ratios are strong predictors of performance.

---

[13] Mutual funds are regulated by SEC, which requires mutual funds to designate a broad market index against which the fund's performance may be measured.  An index so designated by a mutual fund is commonly referred to as the fund's "benchmark" or "benchmark index."

[14]  *See A Look at 401(k) Plan Fees*, supra, at 7.

[15] *See id.* at 2.

59.     In addition to requiring mutual funds to designate a benchmark index, the SEC also requires mutual funds to disclose certain of the fund's fees and expenses, which are typically expressed as a percentage of assets known as an "expense ratio."  A mutual fund's annual expense ratio is calculated by dividing the fund's operating expenses by the average dollar value of its assets.  The SEC requires every mutual fund to disclose its expense ratio in a standardized format in the fund's prospectus.

60.     In addition to investment management fees, the expense ratio also will reflect certain other fees that may be paid by the mutual fund to other service providers (a practice known as "revenue sharing"), such as "distribution" fees (or, "12b-1 fees"), "sub-transfer agency" fees and other costs, such as for accounting and legal services.  The mutual fund passes along these costs to investors by deducting them from investment returns.

61.     In order to manage operating expenses, a plan sponsor must understand and continually evaluate the plan's expenses, fees and service providers.  The Department of Labor advises:

> As the sponsor of a retirement plan . . . you, or someone you appoint, will be responsible for making important decisions about the plan's management. Your decisionmaking will include selecting plan investments or investment options and plan service providers.  Many of your decisions will require you to understand and evaluate the costs to the plan. . . .  Among other duties, fiduciaries have a responsibility to ensure that the services provided to their plan are necessary and that the cost of those services is reasonable. . . .  As a plan fiduciary, you have an obligation under ERISA to prudently select and monitor plan investments, investment options made available to the plan's participants and beneficiaries, and the persons providing services to your plan. Understanding and evaluating plan fees and expenses associated with plan investments, investment options, and services are an important part of a fiduciary's responsibility. This responsibility is ongoing.[16]

---

[16] U.S. Dep't of Labor, Emp. Benefits Sec. Admin., *Understanding Retirement Plan Fees and Expenses,* 1-2 (Dec. 2011).

62.     The leading mutual fund investment research and services firm, Morningstar,
emphasizes the effect of expenses on fund performance and advises investors to rely on expense
ratios when choosing mutual funds:

> If there's anything in the whole world of mutual funds that you can take to the bank,
> it's that expense ratios help you make a better decision.  In every single time period
> and data point tested, low-cost funds beat high-cost funds. . . . Expense ratios are
> strong predictors of performance. . . .  Investors should make expense ratios a
> primary test in fund selection.  They are still the most dependable predictor of
> performance.[17]

### 3.     High expense ratios were red flags, but Columbus Regional ignored them.

63.     The average annual expense ratios for the Plan's funds were *six times higher* than
the average expense ratios for lower-cost Vanguard index funds invested in the same asset classes
("Vanguard comparables").[18]  This information was readily available to Columbus Regional; every
mutual fund's expense ratio is published at the front of its prospectus.

64.     The use of Vanguard comparables to estimate the cost of investing in a designated
broad market index without incurring substantial additional fees is reasonable and appropriate.[19]

---

[17] Russel Kinnel, *How Expense Ratios and Star Ratings Predict Success* (Aug.  9, 2010)
(emphasis added),   https://www.morningstar.com/articles/347327/how-expense-ratios-and-star-ratings-predict-success.

[18] A mutual fund's benchmark is an index, not a fund.  Index returns do not take fees and
costs into account.  Index *fund* returns, on the other hand, account for fees and costs.  Thus, to
gauge a mutual fund's performance net of fees, it is necessary to identify a comparable product,
another mutual fund invested in the same or substantially the same assets.  Plaintiffs have chosen
Vanguard index funds for this comparison. Vanguard funds often are used as comparables in
ERISA cases.  There are many reputable, competitively priced index fund providers but because
Vanguard is the largest index fund provider, Vanguard products are readily available in the vast
majority of the asset classes in which retirement plans invest.

[19]  *See* Eugene F. Fama & Kenneth R. French, *Luck Versus Skill in the Cross-Section of
Mutual   Fund   Returns*,   65   The   Journal   of   Finance,   1915,   1942-43   (Oct.   2010),
http://mba.tuck.dartmouth.edu/bespeneckbo/default/AFA611-Eckbo%20web%20site/AFA611-S8C-FamaFrench-LuckvSkill-JF10.pdf.

65.    **Schedule B-1** compares the expense ratios of the Plan funds with the expense ratios

of their Vanguard comparables.  Specifically, the schedule lists (i) each fund offered by the Plan,

(ii) that fund's average annual expense ratio ("ER") and (iii) its benchmark.  The schedule then

lists (iv) the corresponding Vanguard comparable and (v) its average annual expense ratio.  Lastly,

for each fund, the schedule shows (vi) the difference between the two expense ratios.  For example,

the Plan's "Janus Balanced A" fund has an expense ratio of 0.85%, while its Vanguard comparable

has an expense ratio of 0.09%, a difference of 0.76%.  The "bottom line" is that the average annual

expense ratio for all funds in the Plan was 0.76% versus 0.12% for the Vanguard comparables, a

difference of 0.64%.

66.    The data compiled in Schedule B-1 is summarized in Figure 1, below.

**Figure 1.**    Plan vs Vanguard Mutual Fund Fees
(in percentages and $ US millions)

| ASSET CLASS | Fund Fees (Asset-Weighted %) | | | Additional Fees (in millions) |
|---|---|---|---|---|
| | *Plan* | *Vanguard* | *Difference* | |
| *Allocation* | | | | |
| Target Date | 1.11 | 0.15 | 0.96 | 0.70 |
| Balanced | 0.85 | 0.08 | 0.77 | 0.70 |
| *Equity* | | | | |
| Large Cap | 0.50 | 0.05 | 0.45 | 0.89 |
| Mid Cap | 0.92 | 0.07 | 0.85 | 0.40 |
| Small Cap | 1.17 | 0.08 | 1.09 | 0.55 |
| International | 0.62 | 0.38 | 0.26 | 0.17 |
| *Fixed Income* | | | | |
| Bond | 0.77 | 0.08 | 0.68 | 0.41 |
| ALL MUTUAL FUNDS* | 0.76 | 0.12 | 0.64 | $ 3.81 million |

* The stable value fund fees are addressed separately below.

67.    Figure 1 compares the cost of the Plan's mutual funds to the cost of their Vanguard

comparables from 2015 through the date the Plan was terminated, May 31, 2019.  (The Plan's stable

value fund is addressed separately, below.). As shown, the actively managed funds selected by Columbus Regional were, on average, six times more expensive (0.76% versus 0.12%) than the Vanguard comparables.

68.     Columbus Regional easily could have determined the costs of the Plan's investments by comparing their expense ratios to those of Vanguard comparables or other index funds invested in the same asset classes.

69.     The annual dollar cost to the Plan's participants of Columbus Regional's decision to pursue an active investment strategy, compared to the cost of comparable but less expensive investment products is shown in Figure 2, below.



**Figure 2.** Plan vs Vanguard Mutual Fund Fees (Annually, in $ US millions)

| Mutual Fund Fees* | 2015 | 2016 | 2017 | 2018 | 2019 | Total |
|---|---|---|---|---|---|---|
| Plan | 0.86 | 0.95 | 1.01 | 1.14 | 0.54 | |
| Vanguard | 0.14 | 0.13 | 0.16 | 0.18 | 0.08 | |
| Additional Fees | 0.72 | 0.82 | 0.85 | 0.96 | 0.46 | 3.81 M |

* As reported, through plan termination on May 31, 2019

70.     As shown in Figure 2, from 2015 through the Plan termination date, the additional cost to participants of Columbus Regional's decision to pursue an active management strategy was $3.81 million.  The returns from the actively managed funds selected by Columbus Regional fell far short of recouping those costs, however, resulting in millions of dollars of losses to Plan participants.

### 4. A prudent fiduciary would have considered index funds.

71.     While expense ratios are not the only consideration a plan sponsor should take into account when making investment decisions, a prudent plan sponsor, knowing the risks of an active management strategy and seeing that the costs of the funds it selected were on average six times higher than comparable index funds, would have considered index funds.

72.     Index funds allow investment in efficient broad markets without incurring unnecessary fees.  According to Morningstar research, in 2019, the asset-weighted average expense ratio for actively managed U.S. mutual funds was 0.66%, while the asset-weighted average expense ratio for passive funds was one-fifth of that, 0.13%.[20]

73.     The index fund approach to investing and controlling costs is fundamentally sound from a trust law perspective.  *See* Restatement (Third) of Trusts § 90 Reporter's General Note on Comments e through h (research supports the use of passive strategies such as index funds); *see also id.* at cmt. h(1) ("Investing in index funds that track major stock exchanges or widely published listings of publicly traded stocks is illustrative of an essentially passive but practical investment alternative to be considered by trustees seeking to include corporate equity in their portfolios.").

---

[20] Morningstar Manager Research, *2019 U.S. Fund Fee Study*, 1 (June 2020), https://www.morningstar.com/lp/annual-us-fund-fee-study.

74.     Index funds comparable to each of the Plan's funds were readily available from Vanguard and other reputable providers, including TIAA-CREF, Fidelity, Schwab, and others.

### 5.     A closer look at expense ratios

75.     **Figure 3**, below, summarizes **Schedule B-2** and shows the investment management, distribution and other fees that make up the total expense ratios of the Plan's mutual funds and their Vanguard comparables.

**Figure 3.** Breakdown of Plan vs Vanguard Fund Expense Ratios
(in percentages and showing resulting additional fees)

| ASSET CLASS | PLAN FEES (in %) | | | VANGUARD FEES (in %) | | | ADDITIONAL FEES (in $ US millions) | | |
|---|---|---|---|---|---|---|---|---|---|
| | Investment | Distribution | Other | Investment | Distribution | Other | Investment | Distribution | Other |
| *Allocation* | | | | | | | | | |
| Target Date | 0.80 | 0.25 | 0.06 | 0.15 | 0.00 | 0.00 | - 0.47 | - 0.18 | - 0.04 |
| Balanced | 0.50 | 0.23 | 0.13 | 0.06 | 0.00 | 0.01 | - 0.39 | - 0.20 | - 0.10 |
| *Equity* | | | | | | | | | |
| Large Cap | 0.25 | 0.15 | 0.10 | 0.05 | 0.00 | 0.01 | - 0.40 | - 0.31 | - 0.18 |
| Mid Cap | 0.51 | 0.22 | 0.17 | 0.06 | 0.00 | 0.01 | - 0.22 | - 0.11 | - 0.08 |
| Small Cap | 0.77 | 0.22 | 0.20 | 0.06 | 0.00 | 0.02 | - 0.36 | - 0.11 | - 0.09 |
| International | 0.34 | 0.143 | 0.14 | 0.36 | 0.00 | 0.03 | 0.01 | - 0.10 | - 0.08 |
| *Fixed Income* | | | | | | | | | |
| Bond | 0.36 | 0.25 | 0.16 | 0.07 | 0.00 | 0.01 | - 0.17 | - 0.15 | - 0.09 |
| | | | | | | Total: | -$2.00 | -$1.16 | -$0.65 |

76.     In each asset class, the component fees charged by the Plan's funds are substantially higher than the fees for the Vanguard comparables.

77.     The largest component of the funds' excess costs were the investment management fees received by the managers of the Plan's actively managed funds.

78.     From the beginning of the class period through the Plan termination date, the investment management fees charged by the Plan's fund managers were approximately $2 million

higher than the investment management fees for comparable Vanguard funds would have been. *See* Figure 3 ("Additional Fees – Investment" column).

79.     The additional investment management fees charged by the Plan's fund managers were not justified because, as shown below, the funds did not generate returns that compensated for those additional fees.

### 6.     Participants were charged other wasteful fees and costs.

80.     Excessive management fees were not the only wasteful costs of the funds, however. As shown in Figure 3 and Schedule B-2, other fees were embedded in the expense ratios of the Plan's funds.

81.     These other fees are significant.  As shown in Figure 3, the additional fees totaled approximately $1.81 million, almost as much as the investment management fees.  *See* Figure 3 ("Additional Fees – Distribution" and "Additional Fees – Other" columns).

### a.     Distribution ("12b-1") fees

82.     As shown in Figure 3, the Plan funds' expense ratios included substantial "distribution" fees.  The corresponding Vanguard funds have no distribution fees.  In a mutual fund, distribution fees are pure waste.

83.     In the mutual fund industry, "distribution" refers to the marketing, advertising and sales of the fund.  Distribution fees are charged to cover the funds' expenses in marketing and advertising to potential investors, and to compensate brokers for selling fund shares.  In the early days of mutual funds, the original (and even then, controversial) justification offered for distribution fees was that growing the size of the fund would create economies of scale that would benefit investors, such as reduced management fees.  While funds have indeed prospered (today, there are more mutual funds than public stocks), a study by an SEC financial economist concludes

that the fees are not benefitting investors: "shareholders are not obtaining benefits in the form of lower average expenses or lower flow volatility. Fund shareholders are paying the costs to grow the fund, while the fund adviser is the primary beneficiary of the fund's growth."[21]

84.    Plan participants received no benefit from the distribution fees. Moreover, even if distribution fees were defensible, the Plan did not need to incur them. Columbus Regional could have negotiated better pricing that did not include distribution fees. Its failure to do so simply wasted participants' money.

### b.    Transactions costs

85.    Actively managed funds also incur other transaction costs that are not included in the fund's expense ratio but which reduce the fund's returns. Such transaction costs are a function of trading; the more trading, the higher the costs.

86.    The SEC requires mutual funds to disclose their annual "turnover ratio," the percentage of the fund's holdings that have changed over the year. It is a measure of trading activity. Turnover ratios vary widely but generally are between 0% and 100%.

87.    The turnover ratios of the funds in the Plan were materially higher than the turnover ratios of their Vanguard comparables). (*See* **Schedule D-1**, comparing turnover ratios of Plan funds versus Vanguard funds).

88.    While there is nothing inherently bad or imprudent in high turnover ratios, imprudent active management is not made better by trading more actively. High turnover increases transaction costs. Here, because Columbus Regional's active management strategy was a failure, the high turnover ratio of the Plan funds reflects needless costs to participants.

---

[21] Lori Walsh, *The Costs and Benefits to Fund Shareholders of 12 b-1 Plans: An Examination of Fund Flows, Expenses and Returns*, 2 (2004), https://www.sec.gov/rules/proposed/s70904/lwalsh042604.pdf.

**D.      The Mutual Funds Selected By Columbus Regional Underperformed The Market, Resulting In Losses To Plan Participants.**

89.      Columbus Regional had a fiduciary duty to monitor and evaluate the performance of the Plan's investments, and to remove and replace imprudent investments.

90.      Columbus Regional did not have a prudent process for monitoring and evaluating the performance of the Plan's investments.

91.      From 2015 through the Plan termination, the Plan's mutual funds significantly underperformed their benchmarks and Vanguard comparables.

92.      If Columbus Regional had monitored and evaluated the performance of the Plan's mutual funds, it would have known that those funds were consistently underperforming both their benchmarks and comparable index funds.  Columbus Regional did not know about, did not correct, and did not prevent, the resulting losses to Plan participants.  The details for each fund are shown in **Schedules E-1** to **E-3**, but the bottom line is summarized in **Figure 4**:

**Figure 4.**     Returns of Plan Mutual Funds vs Vanguard Mutual Funds Through May 31, 2019 (Asset-Weighted and in $US Millions)[22]

| Returns | 2015 | 2016 | 2017 | 2018 | 2019 |
|---|---|---|---|---|---|
| Plan Funds | 0.10 | 6.49 | 16.79 | -4.55 | 8.67 |
| Vanguard Funds | 0.77 | 8.24 | 16.65 | -4.27 | 8.64 |
| **Difference (in %)** | -0.67 | -1.75 | 0.14 | -0.28 | 0.03 |
| **Resulting Loss (in millions)** | -0.93 | -3.51 | -3.88 | -4.21 | -4.52 M |

93.      The losses shown in Figure 4 are calculated by comparing the actual Plan returns with the returns the Plan would have generated had it invested in Vanguard mutual funds (adjusted

_____

[22] The asset weights for this calculation rely on the figures in Columbus Regional's Form 5500s and do not take into account the reinvestment of the excessive fees. This is addressed in the total loss calculation below.

for estimated contributions, withdrawals and administrative expenses).[23]  The annual loss (or gain) so calculated is compounded at the asset-weighted returns of the Vanguard comparables, resulting in losses to participants of $4.52 million as of the Plan termination date, May 31, 2019.

94.    Columbus Regional's investment strategy was spectacularly unsuccessful.  By heedlessly pursuing a strategy it should have known was imprudent, and then, not changing course as that strategy failed, Columbus Regional wasted millions of dollars of Plan participants' money.

### 1. Columbus Regional wasted participants' money by selecting high-priced share classes.

95.    It does not require expertise in portfolio management to know that large buyers can command better prices than small buyers.  That applies to mutual funds as well.

96.    Mutual funds typically offer shares in several classes, including "retail" and "institutional."  Individual and smaller investors are usually able to purchase only retail shares, while institutional shares are typically sold only to larger investors such as retirement plans. Regardless of share class, however, the investment product is exactly the same: the same assets, the same managers, the same investment strategy.  Only the price of the fund, and therefore, the net returns, are different.

97.    Share classes are usually given alphanumeric identifiers, indicating different pricing.  While the nomenclature is not entirely uniform, retail shares are often designated as "A" class shares and institutional shares as "I" class shares.  Share classes specifically designed for retirement plans are often designated by an "R," and run from "R-1" (the most expensive "retail" shares) through "R-6" (the least expensive "institutional" shares).

---

[23] The Restatement "specifically identifies as an appropriate comparator for loss calculation purposes 'return rates of one or more . . . suitable index mutual funds or market indexes (with such adjustments as may be appropriate).'"  *Brotherston v. Putnam Invs., L.L.C.*, 907 F.3d 17, 31 (1st Cir. 2018) (quoting Restatement (Third) of Trusts § 100 cmt. b(1)).

98.     By virtue of their size, large retirement plans like Columbus Regional have substantial bargaining power to obtain low, institutional share class pricing.

99.     Columbus Regional had a duty to obtain the best share class pricing available.  In an analogous context, SEC guidance expressly states that a fiduciary investment advisor "has failed to uphold its fiduciary duty when it causes a client to purchase a more expensive share class of a fund when a less expensive class of that fund is available."[24]

100.     Columbus Regional regularly selected high-cost share classes when it could have obtained low-cost share classes.   For example, from 2015 through the termination of the Plan, Columbus Regional maintained a sizeable investment (between $7.8M and $10.7M) in the R-3 (ticker symbol RFNCX) and R-5 (RFNFX) share classes of the "American Fund Fundamental Investors" fund, *see* **Schedules F-12 and 13**, even though the less expensive R-6 (RFNGX) share class was available to it.

101.     As disclosed in the RFNCX prospectus (excerpted below), the expense ratio (which the prospectus describes as "total annual fund operating expenses") for the R-3 shares Columbus Regional initially selected was 0.96%.  The expense ratio for the R-5 share class Columbus Regional later moved the Plan into was less, 0.36%, but the R-6 share class it should have selected was even less expensive, 0.31%.

---

[24] SEC Office of Compliance Inspections and Examinations, *OCIE's 2016 Share Class Initiative,* 1 (Jul. 13, 2016), https://www.sec.gov/files/ocie-risk-alert-2016-share-class-initiative.pdf.

| Annual Fund Operating Expenses FUNDAMENTAL INVESTORS® | Class R-3 | Class R-5 | Class R-6 |
|---|---|---|---|
| Management fees | 0.25% | 0.25% | 0.25% |
| Distribution and/or service (12b-1) fees | 0.50% | none | none |
| Other expenses | 0.21% | 0.11% | 0.06% |
| Total annual fund operating expenses | 0.96% | 0.36% | 0.31% |

*See* Prospectus (485BPOS) of March 22, 2014 (CIK 0000039473/S000009227) for American Funds Fundamental Investors (RFNCX).[25]  This information was readily available to Columbus Regional: it was in the prospectus.

102.   While the investment management fee component for the R-3, R-5 and R-6 share classes is the same (as it should be: same fund, same manager, same strategy), the R-3 shares include a 12b-1 distribution fee of 0.5% and additional "other" expenses of 0.15%, fees that are not charged against the R-6 share class.  The "other" expenses of the R-5 are 0.05%, less than the R-3 but still higher than for the R-6.  The higher fees of the R-3 and R-5 share classes are for supposed services that add no value, certainly not to the Plan participants.  Moreover, Columbus Regional could have avoided paying those fees altogether by insisting on the lower R-6 share class pricing.

103.   As a result of failing to select the lowest price available share class, Columbus Regional wasted $91,495 of participants' savings on excessive fees from the beginning of the class period through the termination date of the Plan on this single fund alone.  *See* Schedules F-12 and 13 (showing additional fees totaling $77,982 on R-3 and $13,513 on R-5 = $91,495 total wasted fees).

104.   Columbus Regional's failure to obtain the best available share class was not limited to a single fund, however.  As shown in Schedules F-1 through F-23, and summarized in **Figure 5**,

[25] Form 497K American Funds Fundamental Investors, Summary Prospectus (Mar. 1, 2014), https://sec.report/Document/0000051931-14-000258/.  This figure is a composite of two images from the prospectus, with the colored boxes added to distinguish the share classes.

Columbus Regional repeatedly selected and maintained high-cost share classes when it could have selected low-cost share classes.  In all, Columbus Regional selected twenty high-cost share classes for the Plan's investment menu (twenty-three, including instances where Columbus Regional picked the same fund again) when low-cost share classes were available in the same family of funds.

**Figure 5.**  The Plan's Over-Priced Share Classes and Resulting Excess Fees

| Ref | Fund Name | Plan Share Class | Plan ER (%) | Lower Share Class | Lower ER (%) | Assets 2015-19 ($) | Excess Fees ($) |
|------|-----------|------------------|-------------|-------------------|--------------|--------------------|-----------------|
| F-1  | Allianz NFJ Small Cap Value | A | 1.19 | I/ R6 | 0.76 | 9,245,811 | 31,307 |
| F-2  | American Century One Choice In Ret | A | 1.03 | I/ R6 | 0.51 | 5,198,390 | 21,930 |
| F-3  | American Century One Choice 2020 | A | 1.04 | I/ R6 | 0.52 | 13,103,162 | 49,894 |
| F-4  | American Century One Choice 2025 | A | 1.06 | I/ R6 | 0.54 | 10,745,790 | 41,076 |
| F-5  | American Century One Choice 2030 | A | 1.08 | I/ R6 | 0.56 | 11,363,029 | 43,756 |
| F-6  | American Century One Choice 2035 | A | 1.11 | I/ R6 | 0.60 | 10,011,683 | 38,164 |
| F-7  | American Century One Choice 2040 | A | 1.14 | I | 0.63 | 12,075,338 | 46,505 |
| F-8  | American Century One Choice 2045 | A | 1.17 | I | 0.63 | 17,532,866 | 67,321 |
| F-9  | American Century One Choice 2050 | A | 1.19 | I/R6 | 0.68 | 25,019,201 | 95,009 |
| F-10 | American Funds EuroPacific Grwth | R3 | 1.14 | R6 | 0.50 | 15,172,769 | 74,137 |
| F-11 | American Funds EuroPacific Grwth | R5 | 0.54 | R6 | 0.50 | 36,762,298 | 10,850 |
| F-12 | American Funds Fundamental Inv | R3 | 0.96 | R6 | 0.31 | 16,040,801 | 77,982 |
| F-13 | American Funds Fundamental Inv | R5 | 0.35 | R6 | 0.30 | 39,120,373 | 13,513 |
| F-14 | American Funds New Perspective | R3 | 1.11 | R6 | 0.45 | 7,583,135 | 37,314 |
| F-15 | American Funds New Perspective | R5 | 0.49 | R6 | 0.44 | 20,667,987 | 6,257 |
| F-16 | Janus Balanced | A | 0.94 | N | 0.58 | 122,396,472 | 321,373 |
| F-17 | T. Rowe Price Mid Cap Growth | Advisor | 1.02 | I | 0.71 | 38,408,522 | 91,157 |
| F-18 | Victory Established Value | A | 0.97 | I/R6 | 0.60 | 19,204,355 | 51,779 |
| F-19 | MFS Massachusetts Investors Gr Stk | R3/A | 0.74 | R5/R6 | 0.38 | 74,255,850 | 193,315 |
| F-20 | MFS Value | R3/A | 0.85 | R5/R6 | 0.49 | 55,896,403 | 144,587 |
| F-21 | Prudential Total Return Bond | A | 0.78 | R6 | 0.42 | 77,909,691 | 203,703 |
| F-22 | Emerald Growth | Investor | 1.15 | I | 0.77 | 24,207,193 | 65,177 |
| F-23 | JPMorgan Undis. Mgrs Behavioral Value | A | 1.37 | I | 1.13 | 22,128,966 | 41,255 |
| | Excess Fees | | | | | | **$ 1,767,360** |

105.    Columbus Regional's failure to obtain the best available share class pricing for the funds it selected cost Plan participants almost $1.8 million in unnecessary fees from the beginning of the class period to the Plan termination.   To save that money, Columbus Regional did not have to change investments, it merely had to insist on the pricing its market power gave it.

**2.      Columbus Regional wasted participants' money because it did not prudently select, evaluate or monitor the target                date funds.**

106.     Columbus Regional selected for the Plan a family of "target date retirement funds" (or, "TDFs") managed by American Century.  The Plan participants' investments in these funds ranged from about $10 million in 2015 to about $20 million in 2019, representing approximately 10% to 14% of the Plan's assets. The target date funds were the Plan's default investment option in the absence of investment instructions from an individual participant.

107.     Unlike regular mutual funds, target date funds do not invest in individual securities. They are specialized "fund-of-funds" that invest in multiple equity and debt funds.  The balance of equity and debt in a target date fund is determined according to the target retirement date of the investor and rebalances to become more conservative as the target date approaches (the sliding balance is referred to as the fund's "glide path").  The Department of Labor advises that, within this general framework, there are many differences that "can significantly affect the way a TDF performs, [thus] it is important that fiduciaries understand these differences when selecting a TDF as an investment option for their plan."[26]

108.     Target date funds require considerable diligence on the part of the plan sponsor. The Department of Labor provides detailed guidance for selecting and maintaining target date funds:

•      "Establish a process for comparing and selecting TDFs. . . .  [P]lan fiduciaries should engage in an objective process to obtain information that will enable them to evaluate the prudence of any investment option made available under the plan. . . . [I]n

---

[26] U.S. Dep't of Labor, Emp. Benefits Sec. Admin., *Target Date Retirement Funds - Tips for ERISA Plan Fiduciaries,* 1 (Feb. 2013), https://www.dol.gov/sites/dolgov/files/EBSA/about-ebsa/our-activities/resource-center/fact-sheets/target-date-retirement-funds.pdf.

selecting a TDF you should consider prospectus information, such as information about the performance (investment returns) and investment fees and expenses."

• "Establish a process for the periodic review of selected TDFs. Plan fiduciaries are required to periodically review the plan's investment options to ensure that they should continue to be offered."

• "[I]f the fund's manager is not effectively carrying out the fund's stated investment strategy, then it may be necessary to consider replacing the fund."

• Fiduciaries must "[u]nderstand the fund's investments – the allocation in different asset classes (stocks, bonds, cash), individual investments, and how these will change over time."

• "Make sure you understand the fund's glide path, including when the fund will reach its most conservative asset allocation and whether that will occur at or after the target date."

• "Review the fund's fees and investment expenses. TDF costs can vary significantly . . . . Small differences in investment fees and costs can have a serious impact on reducing long term retirement savings."[27]

---

[27] *Id.* at 2-3.

109.    To properly evaluate the performance of a target date fund, the plan sponsor must monitor the fees and performance not only of the target date fund itself (at the "fund-of-funds" level), but each of the underlying funds as well.[28]   In sum, a prudent plan sponsor should not select target date funds without thoroughly understanding them.

110.    Columbus Regional did not heed the Department of Labor guidance.  It failed to evaluate and review the target date funds' performance, failed to consider expense ratios and failed to understand the costs of the funds at either the fund-of-funds or underlying level.  It also selected the most expensive share class of target date funds when it could have selected the least expensive.

111.    If Columbus Regional had done its due diligence, it would have known that the American Century One funds did not have a consistent track record of outperforming the market. **Schedule E-4** shows the overwhelmingly negative excess returns of the American Century One funds compared to their benchmark S&P target date indices for the years preceding the class period.   None of the funds managed to beat its benchmark consistently.  As a group, the funds showed no consistent ability to outperform the market in the years leading up to the class period.

112.    Additionally, the vast majority of the underlying funds in which the American Century One target date funds invested consistently underperformed their benchmarks, both prior to the beginning of the class period and thereafter.  *See* **Schedule E-5**.

113.    Moreover, S&P Global performance data confirms that the underlying funds in which the target date funds invested consistently and substantially underperformed their benchmarks across all asset classes.  *See* Schedule C-2 (reporting data over 1 year to 15 year periods).

---

[28] *Id*. at 2.

114.    Columbus Regional did not make a determination that the costs of the target date funds it selected were justified by a realistic prospect of excess returns.  Having failed to conduct the required due diligence on the fees, as well as the performance of the funds at either the fund-of-funds or underlying level, Columbus Regional had no way of knowing whether there was a reasonable expectation that the target date funds would cover their costs.

115.    Moreover, for each of these funds, Columbus Regional selected the most expensive share class, Class A, when the very same funds were available in a much lower priced, institutional share class ("Class R-6" or "Institutional," depending on the year).  As shown in Schedules F-2 to F-9, the expense ratios for the Class A shares selected by Columbus Regional ranged from 1.02% to 1.20% versus 0.51% to 0.68 for the R-6 or Institutional shares of the very same funds.  The total amount of excess fees the Plan participants absorbed from the beginning of the class period through the Plan termination date as a result of this failure alone was $403,654.

116.    Prudence required Columbus Regional to give careful consideration to low-cost target date index funds.  There were many low-cost index funds available in the target date (or "balanced") asset class, including Vanguard Target Retirement funds.  *See* Figure 1 (showing average annual expense ratio of 1.10% for Plan's target date funds versus 0.16% expense ratio for Vanguard comparables, and Schedule B, showing expense ratios for Class R6 or Institutional American Century target date funds ranged from .51% to .68%).  Ignoring the basics of fiduciary investment management, Columbus Regional selected and retained high-cost American Century target date funds when far less expensive comparable index fund products were available.

117.    Columbus Regional's low percentage bet on the high-cost managers at American Century did not pay off.  As summarized in **Figure 6**, (*see* Schedules F-2 through F-9 for more detail), the American Century One funds consistently failed to beat their benchmarks.

**Figure 6.**     Percent Difference in Performance of Plan vs Vanguard Target Date Funds
From January 1, 2015 to May 31, 2019

| Plan Fund | Vanguard Benchmark | 2015 | 2016 | 2017 | 2018 | 2019 | Total |
|---|---|---|---|---|---|---|---|
| Am Cent One Choice in Ret A | Vang'd Target Ret. Inc. Fund Inv. | -1.67 | 0.64 | 1.42 | -1.87 | 2.19 | 0.26 |
| Am Cent One Choice 2015 A | Vang'd Target Ret. 2015 | - | - | - | - | - | - |
| Am Cent One Choice 2020 A | Vang'd Target Ret. 2020 | -1.6 | -1.52 | -2.15 | -0.34 | -0.81 | -7.89 |
| Am Cent One Choice 2025 A | Vang'd Target Ret. 2025 Inv | -1.54 | -1.83 | -2.56 | -0.16 | -1.39 | -9.2 |
| Am Cent One Choice 2030 A | Vang'd Target Ret. 2030 Inv | -1.34 | -2.26 | -2.95 | 0.21 | -1.95 | -10.19 |
| Am Cent One Choice 2035 A | Vang'd Target Ret. 2035 | -1.21 | -2.6 | -3.36 | 0.56 | -2.46 | -11.13 |
| Am Cent One Choice 2040 A | Vang'd Target Ret. 2040 | -1.11 | -2.72 | -3.1 | 0.65 | -2.37 | -10.7 |
| Am Cent One Choice 2045 A | Vang'd Target Ret. 2045 | -1.22 | -2.61 | -2.35 | 0.36 | -1.59 | -9.42 |
| Am Cent One Choice 2050 A | Vang'd Target Ret. 2050 Inv. | -1.27 | -2.62 | -2.01 | 0.09 | -0.59 | -8.42 |

118.    Overall, only one of the target date funds (first row of Figure 6) outperformed its
benchmark, and that marginally (+0.26 %), while the other funds underperformed dramatically (-
7.89 % to -11.13 %).  Columbus Regional never should have selected American Century target date
funds for inclusion in the Plan, but having made that mistake, it should have quickly removed and
replaced them.

> **3.     Columbus Regional wasted participants' money because it
> failed to appropriately select and monitor the Plan's stable
> value fund.**

119.    The single largest asset in the Plan was the Transamerica Guaranteed Pooled Fund,
a proprietary "stable value fund" provided by Transamerica.  From 2015 to the Plan termination,
the Transamerica stable value fund held approximately $25 million in assets, some 15% to 20% of
the total Plan assets.  A prudent fiduciary, recognizing the importance of the fund in the Plan's
investment lineup, would have taken great care in selecting and monitoring this investment option.
Columbus Regional did not.

120.    Stable value funds are unique investments available only in ERISA defined
contribution plans and certain other tax-advantaged plans.  A stable value fund is a conservative,
capital preservation investment product typically composed of high quality, low risk investments.

Stable value funds are designed to provide steady, positive returns and pay a contractually guaranteed return known as a "crediting rate."  The crediting rate is set by the contract and may be reset at predetermined intervals.[29]

121.    The Transamerica stable value fund was subject to the terms of an investment contract between Columbus Regional and Transamerica.  The crediting rate was set in advance by Transamerica and reset semi-annually, as provided in the contract.

122.    Transamerica pooled the assets of the Plan's stable value fund with those of other, unaffiliated retirement plans and invested them.  For its fee, Transamerica kept the "spread," i.e., the difference between the crediting rate amounts Transamerica paid to participants and the returns generated on the pooled assets.

123.    Columbus Regional did not have a prudent process for selecting or monitoring the costs of the Transamerica stable value fund.  Substantially similar products were available from other providers that would have provided far higher returns to the Plan participants.

124.     For example, a substantially identical MassMutual stable value fund would have paid returns that were on average almost three times higher than those of the Transamerica stable value fund (*see* **Figure 7-a**), at a savings to Plan participants of $2.71 million (*see* **Figure 7-b**).

---

[29]    *See* *generally* Stable Value Investment Association, *Knowledge*, https://stablevalue.org/knowledge (follow links for "Basics" and "Glossary").

**Figure 7-a.**  Difference in Crediting Rates Net of Fees of Plan vs
Mass Mutual Stable Value Funds (in percentages)



**Figure 7-b.**  Additional Costs Due to Difference in Crediting Rates
(in $ US millions)

|  | 2015 | 2016 | 2017 | 2018 | 2019 | Total |
|---|---|---|---|---|---|---|
| TA Stable Value (in %) | 1.00 | 1.00 | 1.12 | 1.25 | 1.75 | |
| Mass Mutual Stable Value (in %) | 3.77 | 3.27 | 3.30 | 3.68 | 3.24 | |
| Excess Spread (in %) | -2.77 | -2.27 | -2.18 | -2.43 | -1.49 | |
| **Additional Cost  (in millions)** | 0.74 | 0.57 | 0.55 | 0.62 | 0.19 | $ 2.71 M |

125.     Columbus Regional did not have to scour the marketplace to find a better

performing fund.  The terms and rates of stable value funds are published and readily available.

All Columbus Regional had to do was look.  Columbus Regional simply did not bother to find a

better deal for the Plan participants.

126.     As shown in Figure 7, Plaintiffs estimate that Transamerica received approximately

$2.7 million in excess spread fees for the period 2015 through the Plan termination date.  This

excess cost was entirely foreseeable.  The future return on a stable value product is known in

advance, set by the crediting rate.  Columbus Regional knew the crediting rate when it selected the Transamerica stable value fund and thereafter, as it was reset every six months.

127.     A stable value product is less sensitive to changes in interest rates than conventional bond funds.  Stable value funds are just that: stable.  A stable value product that performs well generally continues to perform well, in a stable manner.  A stable value product that performs poorly, such as the fund selected by Columbus Regional, generally continues to perform poorly, also in a stable manner.

128.     A prudent fiduciary would have known that the Transamerica stable value fund would underperform and that, being a stable value product, it would continue to underperform. Columbus Regional should not have selected the Transamerica stable value fund.  Certainly, as it continued to underperform, Columbus Regional should have removed and replaced it.

### 4.     Columbus Regional wasted participants' money by failing to monitor and control administrative expenses.

129.     Every ERISA plan incurs administrative expenses for recordkeeping and various professional services.  Typically, the plan participants pay for those services, whether directly through deductions from their accounts, or indirectly through higher expense ratios, "revenue sharing" and reduced returns.  Here, the Plan participants paid the Plan's administrative expenses.

130.     ERISA specifically requires a plan sponsor to "defray[ ] reasonable expenses of administering the plan . . . ." 29 U.S.C. § 1104(A)(ii).  The Uniform Prudent Investor Act provides, "[i]n investing and managing trust assets, a trustee may only incur costs that are appropriate and reasonable . . . .  In devising and implementing strategies for the investment and management of trust assets, trustees are obligated to minimize costs."  UPIA at § 7 cmt.

131.     Columbus Regional failed to monitor and control administrative expenses, particularly investment advisory fees to Merrill and recordkeeping fees to Transamerica.

### a.   "Revenue sharing" hid the Plan's true costs.

132.   The Plan was designed as a revenue sharing plan.  Revenue sharing is the practice of mutual funds paying other service providers' fees (e.g., as here, recordkeeping and investment advisory fees), and passing the cost on to participants through the mutual funds' expense ratio.

133.   Revenue sharing is often touted by the mutual fund industry as a way of controlling expenses.  More often, it drives up administrative expenses while obscuring their true cost.  As a Morningstar commentator explains:

> Revenue sharing occurs within 401(k)s when fund companies cover a plan's administration costs. . . .  These arrangements inevitably create conflicts of interest. Paying plan administrators, financial-advisory firms, and brokerages increases a fund's expenses, thereby making that fund less attractive to shareholders. (The fund industry likes to argue that those extra costs are offset by economies of scale, but that claim rarely proves true.) At the same time, the fund's policy of sharing revenue makes it more appealing to its business partners. Worse for one party, better for the other – the incentives are misaligned. . . .  Disclosure language about revenue-sharing arrangements is often so vague that even Morningstar's researchers, who are paid to understand such material, concede failure.  In short, revenue sharing is an ongoing mess.[30]

134.   While revenue sharing is not necessarily improper, it was abused here.

### b.   Investment advisory expenses

135.   Merrill provided investment advisory services to Columbus Regional, including the selection of recordkeeping providers, and recommendations respecting mutual funds and the Plan's investment menu.  Merrill was compensated, at least in part, with revenue sharing.

136.   Merrill's compensation is not clearly stated in Columbus Regional's statutory disclosures.  Based on Columbus Regional's statutory Form 5500 reporting, however, it appears

---

[30]   John Rekenthaler, *Enough With Revenue Sharing* (September 10, 2019), https://www.morningstar.com/articles/923594/enough-with-revenue-sharing.

Merrill received on the order of $175,000 to $260,000 annually for investment advisory services. *See* **Schedule G.**

137.    Based on publically available data reported by similarly sized ERISA plans, a reasonable fee for the services provided by Merrill was in the range of $50,000 to $75,000 annually. *Id*.

138.    Here, the investment advisory fees charged by Merrill were grossly excessive.

139.    Columbus Regional failed to monitor and control the investment advisory fees charged by Merrill, resulting in substantial losses to Plan participants.

### c.    Recordkeeping expenses

140.    Transamerica provided recordkeeping services to the Plan.  Recordkeeping is a necessary administrative service.   Typical recordkeeper services include providing and maintaining a plan's investment platform, processing plan trades, and tracking participants' account activity.

141.    The market for recordkeeping services is highly competitive. There are numerous high quality recordkeepers that will readily respond to a request for proposal from a large defined contribution plan, like this Plan.  These recordkeepers differentiate themselves primarily on price and vigorously compete for business.

142.    The recordkeeper's costs are a function of the number of plan participants, not the value of their accounts.  The cost of providing recordkeeping services to a participant with a small account balance is the same for a participant with a large balance.

143.    Plans with large numbers of participants can take advantage of economies of scale: a plan with 1,000 participants can negotiate a lower per participant fee than a plan with 100 participants.

144.    From 2015 through the Plan termination date, the Plan had approximately 4,000 to 4,700 participants.

145.    The average account balance in the Plan was relatively large for a Plan of this size. Recognizing this, a plan sponsor with a prudent methodology would have given serious consideration to pricing recordkeeping services on a per capita basis rather than an assets basis, in order to avoid being overcharged.

146.    In selecting a recordkeeper, the sponsor of a large plan such as the Plan must periodically solicit competitive bid proposals from a number of recordkeepers, typically every three years.

147.    Importantly, as part of the bidding process, the plan sponsor must require the recordkeeper to identify not only the level of recordkeeping services and their cost, but also the cost of any proprietary investment products offered by the recordkeeper or its affiliates that the Plan must select (a "bundling" arrangement).  In evaluating the compensation of a recordkeeper, a plan fiduciary must consider the compensation of the recordkeeper from all sources, not only direct payments, but from bundled products and services, fees from separate accounts, and revenue sharing as well.

148.    To monitor recordkeeping costs in the years between periodic bids, a prudent fiduciary must "benchmark" the recordkeeper's fees to make sure they are reasonable.  This involves comparing the recordkeeper's costs to the costs of leading providers in the industry. Benchmarking is necessary both when a recordkeeper is selected, to verify that the initial fees are reasonable, and regularly thereafter, typically once a year.

149.    In this case, Columbus Regional did not implement a prudent process for bidding out recordkeeping services or benchmarking the recordkeeping costs.

150.     Based on publically available information reported by similarly sized ERISA plans, a reasonable recordkeeping fee for the Plan would have been approximately $55 per participant annually, or about $250,000 to $260,000 per year, depending on the number of participants.   *See* Schedule G.

151.     Based on Columbus Regional's statutory Form 5500 disclosures, the recordkeeping fees received by Transamerica averaged approximately $430,000 per year.   *See* Schedule G. Moreover, that was not the only compensation Transamerica received.   Transamerica also was compensated indirectly by bundled fees from its stable value fund.

152.     Transamerica thus received approximately 1.7 to 3.1 times what a reasonable fees would have been, not including the indirect compensation it received.

153.     In determining whether Transamerica's recordkeeping fees were reasonable, Columbus Regional was obligated to consider Transamerica's total compensation from all sources. So considered, Transamerica's compensation from all sources was grossly excessive considering the value of the services it provided, including both recordkeeping and the stable value fund.  The potential for this sort of abuse is precisely why parties-in-interest (such as recordkeepers) are presumptively prohibited from entering into contracts with the plan for other services, such as the stable value fund contract.  *See* 29 U.S.C. § 1106 (a) (prohibited transactions between plan and a party-in-interest).

154.     Columbus Regional should have been aware of this potential for abuse and monitored for it.   Particularly in light of Transamerica's bundling arrangement, Columbus Regional should have scrutinized Transamerica's total compensation.   It failed to do that, and the participants suffered for it.  Whether Plan participants paid Transamerica's excessive fees directly through deductions from their individual accounts, or indirectly as cost of revenue sharing and the

bundling arrangement, they were harmed all the same.  Every dollar of unreasonable recordkeeping fees cost participants a retirement dollar that was no longer available for investment.

> ### d.    The Plan's total administrative expenses were excessive.

155.    As shown in Schedule G, from 2015 through the Plan termination date, the Plan's actual administrative expenses for recordkeeping and investment advisory services were approximately $3.3 million.  Reasonable administrative expenses would have been approximately $1.4 million.

156.    Excessive administrative expenses absorbed by the Plan participants were approximately $1.9 million, not including the indirect compensation received by Transamerica from the spread fees related to the stable value fund.

157.    Columbus Regional failed to monitor and control total administrative expenses, resulting in significant losses to Plan participants.

> ### E.    Columbus Regional Failed To Disclose To Participants The Information They Needed To Make Informed Investment Decisions.

158.    Columbus Regional had a fiduciary obligation "to deal fairly and to communicate to the [participants] all material facts" it knew or should have known respecting their investments. *See* Restatement (Third) of Trusts § 78; *see also Jones*, 370 F.3d at 1072.

159.    Columbus Regional failed to deal fairly and to communicate material facts that Columbus Regional knew or should have known about the Plan's menu options.  Among other matters, Columbus Regional failed to disclose to participants the excessive fees they were paying, and that it had selected higher share classes of mutual funds that would generate excessive fees for those funds, which in turn kicked back a portion of their excessive fees to pay administrative expenses in the form of revenue sharing.

160.    The disclosures Columbus Regional did provide to participants consisted of incomplete and vague boilerplate furnished by the very same service providers that benefitted from the excessive fees and kickbacks.

161.    As a result of its failure to make proper disclosures to participants, Columbus Regional's wasting of Plan assets went unchecked, costing the participants millions of dollars in retirement savings.

**F.  Columbus Regional Is Liable To Participants for their Losses.**

162.    A plan fiduciary that breaches any of the duties and obligations imposed by ERISA is liable to make the plan whole for all losses resulting from the breach.  *See* 29 U.S.C § 1109.  The "remedy in cases of breach of fiduciary duty is the restoration of the trust beneficiaries to the position they would have occupied but for the breach of trust."  *Donovan v. Bierwirth* ("*Bierwirth II*"), 754 F.2d 1049, 1056 (2d Cir. 1985) (citing Restatement (Second) of Trusts § 205(c) (1959)).

163.    Under ERISA, losses are measured according to "the 'total return' measure of loss and damages for breach of trust."  *See Brotherston v. Putnam Invs., L.L.C.*, 907 F.3d 17, 31 (1st Cir. 2018) (citing Restatement (Third) of Trusts § 100).  Thus, the recoverable loss is the amount necessary to restore to the plan to the value it would have had if the plan's assets had been properly administered.  *Id.* (citing Restatement (Third) of Trusts § 100).

164.    Specifically, the calculation of loss "requires a comparison between the actual performance of the Plan and the performance that otherwise would have taken place."  *See Bierwirth II,* 754 F.2d at 1057.

165.    In calculating losses, "the court should presume that the [plan's] funds would have been used in the most profitable" of any reasonable and alternative investment strategies.  *Tibble*

*v. Edison Int'l*, No. CV 07-5359 SVW, at 21 (C.D. Cal. Aug. 16, 2017) (quoting *Bierwirth II*, 754 F.2d at 1056).

166.    "When precise [loss] calculations are impractical, trial courts are permitted significant leeway in calculating a reasonable approximation of the damages suffered. . . .  Any doubt or ambiguity should be resolved against the breaching fiduciaries." *Id.* (citations omitted).

167.    Participants' losses through the Plan termination date of May 31, 2019 are shown in **Figure 8:**

**Figure 8.**    Resulting Loss of Plan Funds v Vanguard
Funds as of May 31, 2019 (in $ US millions)



The calculation in Figure 8 demonstrates the impact of the excessive investment-related fees and administrative expenses on participants.  The performance of the Plan assets is calculated using the asset weighted returns of the Plan's funds adjusted for participant contributions and withdrawals.  The performance of the Vanguard Funds is the performance the Plan assets would have had if they had been prudently invested.  This is calculated using the asset-weighted returns of the Vanguard funds adjusted for participant contributions, withdrawals and an allowance for

reasonable administrative expenses. As shown, participants' total investment losses were approximately $4.6 million as of May 31, 2019.

168.    While the Plan terminated on May 31, 2019, the participants' losses continue to compound at the rate their investments would have earned had they been prudently invested.  The Restatement (Third) of Trusts "specifically identifies as an appropriate comparator for loss calculation purposes 'return rates of one or more . . . suitable index mutual funds or market indexes (with such adjustments as may be appropriate).'"  *Brotherston*, 907 F.3d at 31 (quoting Restatement (Third) of Trusts, § 100 cmt. b (1)).

## CLASS ALLEGATIONS

169.    ERISA authorizes any plan participant or beneficiary to bring an action individually on behalf of the plan for appropriate relief under 29 U.S.C. 1109(a) for a plan fiduciary's breach of duty, including all losses resulting from such breach and such other equitable or remedial relief the court may deem appropriate.  *See* 29 U.S.C. § 1132(a)(2).

170.    Acting in this representative capacity, and as an alternative to numerous direct individual actions brought by participants on behalf of the Plan under 29 U.S.C. §1132(a)(2), Plaintiffs seek to certify a class action on behalf of participants and beneficiaries of the Plan. Plaintiffs seek to certify the following Class, and to be appointed as representatives ("Named Plaintiffs") of the Class:

> All persons and beneficiaries of the Piedmont Columbus Regional Retirement Savings Plan, *f/k/a* Columbus Regional Healthcare System Retirement Savings Plan from February 1, 2015 through the date of judgment, *excluding* Defendant, Piedmont Healthcare, Inc. and (a) any person who was or is an officer, director, employee, or a shareholder of 5% or more of the equity of Defendant or is or was a partner, officer, director, or controlling person of Defendant; (b) the spouse or children of any individual who is an officer, director or owner of 5% or more of the equity of Defendant; (c) Plaintiffs' counsel; (d) judges of the Court in which this case is pending and their current spouse and children; and, (e) the legal representatives, heirs, successors and assigns of any such excluded person.

171. This action meets the requirements of Fed. R. Civ. P. 23 and is certifiable as a class action for the following reasons:

a. While the precise number of Class Members is unknown to Plaintiffs at this time and can only be finally ascertained from books and records under the exclusive control of and maintained by Defendant and/or its agents, Plaintiffs believe after inquiry that there are thousands of members of the Class located throughout the United States and that joinder of all members is impracticable.

b. Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class because defendant owed fiduciary duties to the Plan and to all participants and beneficiaries and took actions and omissions alleged herein as to the Plan and not as to any individual participant; thus, there are effectively no individual issues. The common questions of law and fact include, without limitation:

(i) the identity of the fiduciaries subject to liability under 29 U.S.C. § 1109 (a);

(ii) whether the fiduciaries of the Plan discharged their duties with the care, skill, prudence and diligence that a prudent person acting in a like capacity and familiar with such matters would use;

(iii) whether the fiduciaries, prior to the time they engaged in the transactions described herein, had policies and procedures to investigate the merits of the investments and to structure the investments;

(iv) whether the fiduciaries followed the policies and procedures to investigate the merits of the investments and to structure the investments prior to making such investments;

(v) whether the fiduciaries had policies and procedures to monitor the prudence of the investments on an ongoing and regular basis, including but not limited to share prices as alleged herein;

(vi) whether the fiduciaries followed the policies and procedures to monitor the prudence of the investments on an ongoing and regular basis, including but not limited to share prices as alleged herein;

(vii) whether the fiduciaries understood and evaluated the plan fees and expenses associated with the plan's investments;

(viii) whether the fiduciaries discharged their duties with respect to the plan solely in the interest of the participants and beneficiaries for the exclusive purpose

of providing benefits to participants and their beneficiaries and defraying reasonable expenses of administration of the plan;

(ix)    whether any fiduciary knowingly participated in a breach of duty by another fiduciary;

(x)    whether any fiduciary knowingly failed to cure a breach of duty by another fiduciary;

(xi)    the losses to the Plan resulting from each breach of fiduciary duty;

(xii)    what Plan-wide equitable and other relief should the Court impose in light of Defendant's breach of duty; and,

(xiii)    whether the breaches alleged herein implicate the same set of concerns as to all the funds in the Plan and require similar inquires and proof.

172.    Named Plaintiffs' claims are typical of the claims of the Class because Named Plaintiffs were participants in the Plan during the time period at issue in this action and all participants in the Plan were harmed in the same manner by Defendant's misconduct. The legal theories upon which Plaintiffs are proceeding are typical as well.

173.    Named Plaintiffs are adequate representatives of the Class because they were participants in the Plan.  Plaintiffs and all the Class Members were the subject of the same pattern and practices of equitable and statutory violations, and all sustained damages arising out of the same wrongful course of conduct.  Defendant has acted or refused to act on grounds generally applicable to the Class.  Named Plaintiffs have no interest in conflict with the Class, are committee to the vigorous representation of the Class, and have engaged experience and competent attorneys to represent the Class.

174.    Prosecution of separate actions for these breaches of fiduciary duties by individual participants and beneficiaries would create the risk of (A) inconsistent or varying adjudications that would establish incompatible standards of conduct for Defendant in respect to the discharge of their fiduciary duties to the Plan and personal liability to the Plan under 29 U.S.C. § 1109(a),

and (B) adjudications by individual participants and beneficiaries regarding these breaches of fiduciary duties and remedies for the Plans, as a practical matter, would be dispositive of the interests of the participants and beneficiaries not parties to the adjudication or would substantially impair or impede those participants' and beneficiaries' ability to protect their interests.

175.    Therefore, this action should be certified as a class action under Fed. R. Civ. P., Rule 23(b)(1)(A) or (B).

176.    A class action is the superior method for the fair and efficient adjudication of this controversy because joinder of all participants and beneficiaries is impracticable, the losses suffered by individual participants and beneficiaries may be relatively small and impracticable for individual members to enforce their rights through individual actions, and the common questions of law and fact predominate over individual questions.  Given the nature of the allegations, no class member has an interest in individually controlling the prosecution of this matter, and Named Plaintiffs are unaware of any difficulties likely to be encountered in the management of this matter as a class action.  Alternatively, then, this action may be certified as a class action under Fed. R. Civ. P. Rule 23(b)(3), if it is not certified under Rule 23(b)(1)(A) or (B).

177.    Named Plaintiffs' counsel, James White Firm, LLC (Birmingham, Alabama) and Williamson and York, LLC (Atlanta, Georgia), will fairly and adequately represent the interests of the Class and are best able to represent the interests of the Class under Fed. R. Civ. P. Rule 23(g). Counsel are experienced attorneys with extensive experience in complex litigation, including ERISA and other federal class action litigation.

## PLAN WIDE RELIEF

178.    Additionally and alternatively, Plaintiffs bring this action as Plan participants seeking Plan wide relief for breach of fiduciary duty on behalf of the Plan.  29 U.S.C. § 1132(a)(2).

Columbus Regional's fiduciary duty was to the Plan and the Plan itself was injured by Columbus Regional's breach of its fiduciary duty; thus, Plaintiffs demand that Columbus Regional make good to the Plan all losses to the Plan caused by its breach of its fiduciary duty. *See* 29 U.S.C. § 1109. The absent Plan participants are adequately represented and the Plan participants are so numerous that the delay and expense of joining them would be oppressive and burdensome. Plaintiffs will take adequate steps to properly act in a representative capacity on behalf of the Plan, will protect absent parties' interest as well as the interest of the judicial proceedings.

### NO ADMINISTRATIVE REMEDY

179.    Plaintiffs have no administrative remedy.

180.    The Plan was terminated on May 31, 2019, and its assets were distributed to participants.

181.    Columbus Regional has no administrative process for claims respecting the now terminated Plan.

182.    On August 27, 2020, counsel for Plaintiffs wrote to Columbus Regional requesting documents and information pursuant to 29 U.S.C. § 1024(b)(4) and specifically requested documents respecting any applicable administrative procedures.

183.    On September 25, 2020, Columbus Regional responded through counsel, and produced certain documents. Columbus Regional did not specify any purportedly applicable administrative procedures nor did it direct Plaintiffs to any specific document(s).

184.    Even if the Plan had remained in existence, the Plan's governing documents do not provide a process or remedy for claims such as Plaintiffs bring here, for breach of fiduciary duty.

185.    The administrative process described in Columbus Regional's Base Plan Document is tailored to routine claims for benefits made by an individual claimant. That process does not

provide for class-wide claims for breaches of fiduciary duty resulting in losses totaling millions of dollars.

186.    Additionally, the Summary Plan Description that Columbus Regional gave participants expressly provides that "[i]f it should happen that Plan fiduciaries misuse the Plan's money . . . you may seek assistance from the U.S. Department of Labor, or you may file suit in federal court."

187.    Moreover, ERISA plan participants have a statutory right to bring a civil action for ERISA violations that is separate and distinct from their right to bring an action to recover benefits. *See* 29 U.S.C. § 1123 (compare subsection (a)(1)(B), respecting right to bring action for benefits, with (a)(3), respecting right to bring action for ERISA violations).

188.    Accordingly, there can be no exhaustion requirement here for the simple reason that the Plan was terminated and there is no longer any administrative process respecting the Plan. Further, even if there were an administrative process, it would not apply.  Moreover, Plaintiffs have a statutory right under ERISA to bring their claims in this Court, a right that is not subject to an administrative review process, as acknowledged by Columbus Regional in the Summary Plan Description.

## COUNT ONE:  Breach of Fiduciary Duty Under 29 U.S.C. § 1104 (a)(1)(A) and (B)

189.    Columbus Regional was obligated to discharge its duties to the Plan and its participants with the care, skill, prudence and diligence of a competent investment fiduciary charged with the responsibility for investing millions of dollars of retirement savings on behalf of thousands of investors.

190.    Columbus Regional had the duty to select prudent investments for the Plan, to systematically monitor those investments, and to remove and replace imprudent investments.

191.    Columbus Regional had the duty to investigate the merits of the investments it chose, to determine that its investment strategy was justified by realistically evaluated return expectations, and to conclude there was a credible basis for concluding the fund managers charged with implementing that strategy had the competence to do so successfully.

192.    Columbus Regional failed to appropriately discharge its fiduciary duties to the Plan and its participants.

193.    Columbus Regional did not have a prudent process for evaluating, choosing and monitoring investments.

194.    Columbus Regional selected imprudent investments for the Plan.

195.    Columbus Regional failed to monitor the Plan's investments, and failed to remove and replace imprudent investments.

196.    Columbus Regional failed to determine that its investment strategy was justified by realistically evaluated return expectations.

197.    Columbus Regional had no credible basis to conclude that the investment advisors and managers responsible for carrying out Columbus Regional's investment strategy were competent to do so successfully.

198.    Specifically, among other failings, Columbus Regional (i) failed to have a prudent process for systematically evaluating, selecting and monitoring the investments it selected for the Plan; (ii) failed to appropriately weigh the risks and costs of its investment strategy and determine that those risks and costs were justified by reasonably expected returns; (iii) failed to give appropriate consideration to expense ratios when selecting mutual funds; (iv) failed to obtain the best available share class pricing of the mutual funds it chose; (v) failed to evaluate the target date funds it selected at both the fund and "fund-of-funds" levels; (vi) failed to prudently select and

monitor the Plan's stable value fund; and (vii) failed to delegate its duties prudently, including failing to have a credible basis to conclude that the investment professionals responsible for carrying out its investment strategy were competent to do so successfully, and failing to appropriately monitor and supervise their performance.

199.    Columbus Regional's breaches were so numerous and pervasive, and the Plan's investment menu contained so many imprudent selections, that the entire Plan was rendered imprudent.

200.    Columbus Regional failed to discharge its duties under 29 U.S.C. § 1104(a)(1)(A) and (B).

201.    Columbus Regional is liable under 29 U.S.C. § 1109(a) to make good to the Plan any losses to the Plan resulting from the breaches of fiduciary duties alleged in this Count, and for such other equitable or remedial relief the Court deems appropriate.

202.    Columbus Regional is liable for losses resulting from the breaches alleged in this Count in an amount to be determined at trial.  Total losses resulting from Columbus Regional's breaches are estimated to be approximately $4.6 million as of May 31, 2019, which loss continues to compound at an appropriate market rate.

### COUNT TWO:  Breach of Fiduciary Duty Under 29 U.S.C. § 1104 (a)(1)(A)(ii)

203.    Columbus Regional was obligated to discharge its fiduciary duties solely in the interest of participants and for the exclusive purpose of defraying the reasonable expenses of administering the Plan.  *See* 29 U.S.C. § 1104(a)(1)(A)(ii).

204.    In investing and managing the Plan's assets, Columbus Regional was permitted to incur only appropriate and reasonable costs.  *See* UPIA at § 7 and cmt.

205.    Columbus Regional failed to defray the Plan's administrative expenses as required.

206.    Columbus Regional failed to incur only appropriate and reasonable administrative expenses.

207.    Columbus Regional failed to have a prudent process for evaluating and monitoring the Plan's service providers or their compensation.  Without limitation, Columbus Regional failed to benchmark the amounts paid to service providers, to negotiate with service providers to obtain services at market rates, and to solicit requests for proposals at appropriate intervals.

208.    As a result, the Plan's administrative expenses were excessive, approximately $2 million more than would have been reasonable, resulting in losses to the Plan participants.

209.    Columbus Regional is liable under 29 U.S.C. § 1109(a) to make good to the Plan any losses to the Plan resulting from the breaches of fiduciary duties alleged in this Count, and for such other equitable or remedial relief the Court deems appropriate.

210.    Columbus Regional is liable for losses resulting from the breaches alleged in this Count in an amount to be determined at trial.  Total losses resulting from Columbus Regional's breaches are estimated to be approximately $4.6 million as of May 31, 2019, which loss continues to compound at an appropriate market rate.

**COUNT THREE: Prohibited Transactions Under 29 U.S.C. § 1106 (a)(1)(C)**

211.    Plaintiffs incorporate paragraphs 13 and 14 above (alleging Transamerica and Merrill are each a statutory party in interest with respect to the Plan).

212.    Section 406 of ERISA prohibits certain transactions between a plan and a "party in interest"[31] and imposes liability upon the responsible plan fiduciary for causing the plan to enter into any such prohibited transaction: "A fiduciary with respect to a plan shall not cause the plan to

---

[31] ERISA defines "party in interest" to include "any fiduciary" of a plan and "a person providing services" to a plan.  *See* 29 U.S.C. § 1002 (14)(A)-(B).

engage in a transaction, if he knows or should know that such transaction constitutes a direct or indirect . . . furnishing of goods, services or facilities between the plan and a party in interest . . . ." 29 U.S.C. § 1106 (a)(1)(C).

213.    In 2012, the United States Department of Labor ("DOL") established disclosure requirements that service providers to ERISA plans must satisfy to qualify for a statutory exemption from ERISA's prohibited transaction provisions.[32] *See* Reasonable Contract or Arrangement Under Section 408(b)(2) – Fee Disclosure, 77 Fed. Reg. 5632 (Feb. 3, 2012) (guidance respecting 29 CFR 2550.408b-2).

214.    As the DOL explains,

> The furnishing of goods, services, or facilities between a plan and a party in interest to the plan generally is prohibited under section 406(a)(1)(C) of ERISA. As a result, a service relationship between a plan and a service provider would constitute a prohibited transaction, because any person providing services to the plan is defined by ERISA to be a "party in interest" to the plan. However, section 408(b)(2) of ERISA exempts certain arrangements between plans and service providers that otherwise would be prohibited transactions under section 406 of ERISA. Specifically, section 408(b)(2) provides relief from ERISA's prohibited transaction rules for service contracts or arrangements between a plan and a party in interest if the contract or arrangement is reasonable, the services are necessary for the establishment or operation of the plan, and no more than reasonable compensation is paid for the services.

*Id. See also* Emp. Ben. Sec. Admin., U. S. Dept. of Labor, Final Regulation Relating To Service Provider Disclosures Under Section 408(b)(2) [Fact Sheet] (Feb 2012).

215.    The rationale for the disclosure requirements is that ERISA

> requires plan fiduciaries, when selecting and monitoring service providers and plan investments, to act prudently and solely in the interest of the plan's participants and beneficiaries. Responsible plan fiduciaries also must ensure that arrangements with their

---

[32] "Section 408 exemptions are affirmative defenses for the defendant, not items that a prohibited-transaction plaintiff must address in [its] complaint." *Allen v. GreatBanc Trust Co.*, 835 F.3d 670, 677-78 (7th Cir. 2016). "There are certain limited exceptions to ERISA's prohibited transaction rules; however, the burden to establish the applicability of the exemption lies with the one trying to claim it." *Becker v. Wells Fargo & Co.*, No. 20-2016 (DWF/BRT), at *11 (D. Minn May 12, 2021) (citing *Braden v. Wal-Mart Stores*, 588 F.3d 585, 601 (8th Cir. 2009)).

service providers are "reasonable" and that only "reasonable" compensation is paid for services.   Fundamental to the ability of fiduciaries to discharge these obligations is obtaining information sufficient to enable them to make informed decisions about an employee benefit plan's services, the costs of such services, and the service providers.

Emp. Ben. Sec. Admin., Fact Sheet.

216.   ERISA provides a safe harbor for contracts or arrangements with a party in interest for "services necessary for the establishment or operation of the plan, if no more than reasonable compensation is paid therefor."  *See* 29 U.S.C. § 1108(b)(2)(A).

217.   Section 1108 further provides, however, that "[n]o contract or arrangement for services between a covered plan and a covered service provider,[33] nor any extension or renewal, is reasonable" unless certain disclosure requirements are satisfied.  *See id.* at § 1108 (c)(1)(i).

218.   Among other requirements, the service provider must initially disclose in writing to a responsible plan fiduciary the following information: a description of the services to be provided; whether the provider is acting as a fiduciary; a description of all direct compensation the provider expects to receive; a description of all indirect compensation the provider expects to receive; and a description of any compensation paid to the provider by related parties (i.e., revenue sharing, such as 12b-1 fees paid by mutual funds).  *See* 29 C.F.R. § 2550.408b-2(c)(1)(iv) (2022). In general, these disclosures must be made "reasonably in advance of the date the contract or arrangement is entered into, and extended or renewed . . . ."  *See id.* at § 2550.408b-2(c)(1)(v)(A).

219.   Thereafter, the service provider must disclose changes to the required information as soon as practicable but not later than sixty days from the date the provider is informed of such

---

[33] "The term 'covered service provider' means a service provider that enters into a contract or arrangement with the covered plan and reasonably expects $1,000 . . . or more in compensation, direct or indirect, to be received in connection with providing . . . brokerage services . . . recordkeeping services . . . compliance services" and various consulting services.  See 29 U.S.C. § 1108 (b)(2)(B)(ii)(I)(bb)(AA)-(BB).

changes. *See id.* at § 2550.408b-2 (c)(1)(v)(B)(1). Additionally, the service provider must disclose, "at least annually," changes to certain information respecting fiduciary, recordkeeping, and brokerage services. *See id.* at § 2550.408b-2 (c)(1)(v)(B)(2).

220.    These disclosure requirements are referred to generally as "408b-2 disclosures," a reference to the regulation implementing ERISA's statutory disclosure requirements.

221.    If a covered service provider does not provide the required 408b-2 disclosures to a responsible plan fiduciary (e.g., a plan sponsor), the fiduciary may avoid liability for a prohibited transaction if, among other requirements: the fiduciary, upon discovering that the service provider failed to provide the 408b-2 disclosures, requests in writing that the provider disclose the required information; and, if the provider fails to timely provide the requested information, the fiduciary notifies the DOL of the failure, and the fiduciary terminates the contract or arrangement with the provider as expeditiously as possible, consistent with the duty of prudence. *See id*. at § 2550.408b-2 (c)(1)(ix).

222.    Columbus Regional, as the Plan sponsor, was the responsible plan fiduciary for the Plan.

223.    Transamerica Retirement Solutions ("TRS") was the recordkeeper for the Plan and was a covered service provider with respect to the Plan.

224.    Merrill provided brokerage and other services to the Plan and was a covered service provider with respect to the Plan.

225.    Columbus Regional signed and/or otherwise approved of the contracts and arrangements with Transamerica and Merrill, thus causing the Plan to engage, directly or indirectly, in prohibited transactions for services with Transamerica and Merrill.

226.   TRS did not provide the required 408b-2 disclosures to Columbus Regional, including disclosures respecting compensation of its affiliated entity, Transamerica Financial Life Insurance Company.

227.   Merrill did not provide the required 408b-2 disclosures to Columbus Regional.

228.   Because of its failure to provide the required 408b-2 disclosures, Transamerica's compensation was unreasonable as a matter of law.

229.    Because of its failure to provide the required 408b-2 disclosures, Merrill's compensation was unreasonable as a matter of law.

230.   Because its compensation was unreasonable, Transamerica's contracts and arrangements with Columbus Regional, and payments made pursuant to those contracts and arrangements, constitute prohibited transactions.

23l.   Because its compensation was unreasonable, Merrill's contracts and arrangements with Columbus Regional, and payments made pursuant to those contracts and arrangements, constitute prohibited transactions.

232.   When it did not receive the required 408b-2 disclosures from Transamerica and/or Merrill, Columbus Regional did not request that information from them, nor notify DOL, nor terminate them.

233.   Columbus Regional is thus liable for having caused the Plan to engage in prohibited transactions with Transamerica and Merrill, in breach of its fiduciary duty to the Plan.

234.   Columbus Regional is liable to make good to the Plan the losses to the Plan resulting from that breach, to restore to the Plan the profits made by Transamerica and Merrill, and for such other equitable relief as the Court may deem appropriate.

**PRAYER FOR RELIEF**

235.    For these reasons, Named Plaintiffs, on behalf of the Plan and all similarly situated

Plan participants and beneficiaries, respectfully request that the Court:

(A)    Find and declare that the Defendant has breached its fiduciary duties as described

above;

(B)    Find and adjudge that Defendant is liable to make good to the Plan all losses to the

Plan resulting from each breach of fiduciary duty, and to otherwise restore the Plan to the position

it would have occupied but for the breaches of fiduciary duty;

(C)    Determine the method by which Plan losses under 29 U.S.C. § 1109(a) should be

calculated, including, without limitation, lost investment opportunity;

(D)    Order Defendant to provide an accounting necessary to determine the amounts

Defendant must make good to the Plan under § 1109(a);

(E)    Surcharge against Defendant and in favor of the Plan all amounts involved in any

transactions which such accounting reveals were improper, excessive, and/or in violation of

ERISA;

(F)    Certify the Class, appoint Named Plaintiffs as class representatives, and appoint

James White Firm, LLC and Williamson and York, LLC as Class Counsel;

(G)    Award to the Named Plaintiffs and the Class their attorneys' fees and costs under

29 U.S.C. § 1132(g)(1) and the common fund doctrine;

(H)    Order the payment of interest to the extent it is allowed by law; and

(I)    Grant such other relief as the Court deems appropriate.


Respectfully submitted, December 27, 2022.

WILLIAMSON AND YORK, LLC

John Williamson
Ga. Bar No. 765190

jwilliamson@williamsonyork.com
jhw@williamsonyork.com
(678) 358-9317

2727 Paces Ferry Road, SE
Building One, Suite 750
Atlanta, GA 30339

OF COUNSEL:

James H. White, IV
JAMES WHITE FIRM, LLC
2100 Morris Avenue
Birmingham, Alabama 35203
(205) 383-1812
james@whitefirmllc.com

Admitted *pro hac vice*

ATTORNEYS FOR PLAINTIFFS